IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

PHOEBIE MAY HENSLEY, )
)
    Plaintiff, )
)
) CIV-10-1029-F
v. )
)
MICHAEL J. ASTRUE, )
 Commissioner of Social Security )
  Administration, )
)
    Defendant. )

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her concurrent applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I. Background

In her applications, Plaintiff asserted that she became disabled on December 31, 1999.

(TR 94-98, 99-102). At the time she protectively filed her applications on January 10, 2007, Plaintiff was 28 years old. (TR 94, 115). Plaintiff was last insured for Title II benefits on March 31, 2003. (TR 115). She later amended her alleged disability onset date to March 31, 2002. (TR 23). Plaintiff alleged she was disabled due to fibromyalgia, chronic fatigue, sleep apnea, anxiety, urinary problems, arthritis, "high fevers for no reason," migraine headaches, and depression. (TR 118, 119, 155). She obtained a GED in 1986 and previously worked in a variety of jobs, including cook, habilitation training specialist, home health aide, clerk/cashier/stocker, tax preparer, and telephone salesperson. (TR 138).

In Plaintiff's statement concerning her usual daily activities, Plaintiff stated that she stayed in her bed 90 % of each day and that once a week her son drove her to a grocery store for shopping. (TR 165). She indicated that, due to pain and fatigue, she had difficulty taking care of her personal care needs and that her 16- and 19-year-old sons cooked meals and performed all house and yard maintenance chores except that she folded towels and occasionally retrieved mail from her front porch. (TR 166-168). Plaintiff stated that stress increased her pain and fatigue, she had difficulty concentrating, and she was experiencing suicidal thoughts because she felt helpless and hopeless. (TR 171).

Plaintiff's applications were denied initially and on reconsideration by the agency. (TR 45-52, 58-63). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Deramus ("ALJ") on July 8, 2009. (TR 20-44). At this hearing, Plaintiff testified (TR 23-40) that she was 41 years old and lived with her 20-year-old son due to her lack of income. She did not drive because of the side effects of her medications.

According to Plaintiff, her medications helped her symptoms "[j]ust enough" that she did not lie "in bed crying" but caused drowsiness. (TR 30). She stated she had gained 100 pounds in the previous ten years due to pain and fatigue. She attended group therapy sessions for anxiety and depression, and she became nervous around other people. She testified that she was diagnosed with fibromyalgia by Dr. Brown, a rheumatologist, in 2003. Plaintiff stated that she was unable to get out of bed in the mornings due to excruciating pain and exhaustion and that her body felt like it was on fire and bruised all over. In the afternoons, she felt better but the pain returned in the evenings. Two or three days a week, she attempted to perform household cleaning chores for a "[c]ouple of hours," but she "stay[ed] in bed a lot." (TR 38-39). During her hearing, Plaintiff submitted a list of her medications and recent medical treatment. (TR 176, 178). A vocational expert ("VE") also testified at the hearing. (TR 40-44).

The medical record reflects that Plaintiff first sought treatment for fatigue, headaches, weakness, insomnia, and nausea in 2001. (TR 253-254). Plaintiff sought treatment from an orthopedic physician, Dr. Iceton, in July 2001, for left hip and groin pain and swelling. (TR 198). She was diagnosed with bursitis in her hip and injected with pain medication. (TR 198). Dr. Iceton ordered a bone scan, which was negative, and he ordered MRI testing of Plaintiff's hip and lumbosacral spine, and these tests were also negative. (TR 214, 218, 359, 220). Plaintiff was assessed with asthma, migraines, fatigue, weight gain, hip pain, and urinary retention at her treating clinic in June 2001. (TR 251, 252). Plaintiff was assessed with fatigue and obesity in a physical examination conducted at her treating clinic in August

2001. (TR 250). Plaintiff complained of aching "all over," particularly in her back, and she was diagnosed with fibromyalgia by Dr. Evans in December 2002, for which anti-depressant medication was prescribed. (TR 239-240). In December 2003, an examining physician at her treating medical clinic noted that Plaintiff weighed 220 pounds and she was treated for a urinary tract infection. (TR 234). In September 2004, Dr. Brown, a rheumatologist, examined Plaintiff at the request of her family doctor. (TR 322). Plaintiff related a history of back pain beginning in 2000, left hip bursitis, inability to sleep due to pain, depression due to pain, pain when touched and when hugging her children, short term memory problems, lack of energy, stiffness lasting up to two hours in the mornings, pain in her joints and muscles, left hip swelling, and increased stress. (TR 322). On examination, Dr. Brown noted that Plaintiff exhibited positive fibromyalgia-related tender points, and the physician noted a suspected diagnosis of fibromyalgia dependent on laboratory testing to rule out other conditions. (TR 322-323). Plaintiff was prescribed muscle relaxant and sleeping aid medications. (TR 323). In October 2004, Dr. Brown noted that the diagnosis of fibromyalgia was confirmed. (TR 320). Dr. Brown also diagnosed Plaintiff with depression and agoraphobia and advised Plaintiff to continue her current medications. (TR 320). In October 2005, Plaintiff was treated for a urinary tract infection, and she complained of multiple pain areas, fever, and nausea. (TR 434). She indicated she had been diagnosed with fibromyalgia but she was not taking medication for this condition. (TR 434).

  Plaintiff sought treatment from Dr. Chesser in March 2006 for pain, fatigue, and insomnia. (TR 457). According to Dr. Chesser's notes, Plaintiff complained that it "hurt[ ]

to move" and she had gained weight (she weighed 243 pounds). (TR 457). She was diagnosed with fibromyalgia, for which anti-depressant, muscle relaxant, and pain medications were prescribed. (TR 457). Plaintiff was referred to an arthritis specialist, Dr. Leahey, who diagnosed Plaintiff with kyphoscoliosis (abnormal curvature of the spine) and peripheral neuropathy in November 2006. (TR 671). Dr. Leahey later changed the diagnosis to inflammatory polyarthritis in January 2007. (TR 668). Dr. Leahey administered an injection of methadone[1] and prescribed hydrocodone.[2] (TR 668).

Dr. Leahey referred Plaintiff to a pulmonary and sleep disorder specialist, Dr. Sabangan, who examined Plaintiff in January 2007. In this evaluation, Dr. Sabangan noted that Plaintiff complained of being tired and sleepy during the day, difficulty falling asleep, snoring, kicking during sleep, and morning headaches. She also related she had gained 100 pounds during the previous five years. (TR 538). A physical examination of Plaintiff was essentially normal. (TR 539). Plaintiff underwent a sleep study, and Dr. Sabangan interpreted the results as showing obstructive sleep apnea. (TR 532). Plaintiff was scheduled for a study involving the use of a CPAP breathing machine. (TR 532). Dr. Sagangan noted in March 2007 that the CPAP machine provided Plaintiff with 76 % sleep efficiency, although REM (rapid eye movement, or dream-stage, sleep) was non-existent, and that

---

[1] Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000591/

[2] Hydrocodone is a narcotic pain-relieving medication that is available in combination with other ingredients. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014/

Plaintiff was diagnosed with sleep apnea, moderately severe periodic leg movements, type 3 obesity, and depression. (TR 521).

In August 2007, Plaintiff underwent a consultative psychological evaluation conducted by Dr. Massad. (TR 502-506). Plaintiff described fibromyalgia with associated depression and anxiety and chronic depression for the previous seven to eight years, for which she was taking two prescription anti-depressant medications. (TR 502). Dr. Massad noted that Plaintiff also described lack of motivation, anxiety attacks which made it "difficult to be in public places where there are a lot of people," no friends, and a "history of symptoms, past and present, that will likely interfere with timely task completion. Specifically, the claimant has problems with concentration, goal-directed behavior, and stamina." (TR 503). In a mental status exam, the psychologist noted that Plaintiff "presented with depressed and anxious mood" and his diagnosis was major depressive disorder, single episode, moderate without psychotic features and panic disorder with agoraphobia. (TR 504-505). Dr. Massad estimated her global assessment of functioning at 51.[3]

---

[3] The diagnosis of mental impairments "requires a multiaxial evaluation" in which Axis I "refers to the individual's primary clinical disorders that will be the foci of treatment" and Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM IV)(4th ed. 1994), pp. 25-32). A GAF of 51-60 indicates "moderate symptoms," such as a flat affect or occasional panic attacks or "moderate difficulty in social or occupational functioning." Wilson v. Astrue, 602 F.3d 1136, 1142 n. 3 (10th Cir. 2010)(citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000), at 34.

On multiple occasions in 2007, Plaintiff was treated by Dr. Henry for urinary retention problems. (TR 543-550). Plaintiff was treated with urinary dilations and medications. Plaintiff sought treatment by Dr. Shultz, a rheumatologist, for her fibromyalgia beginning in April 2007. (TR 418-420). Dr. Shultz noted that in an examination of Plaintiff in April 2007 that Plaintiff exhibited "all of the classic features of the fibromyalgia syndrome including insomnia, fatigue, diffuse pain, depression, anxiety, restless legs, irritable bowel symptoms, and migraines." (TR 420). Multiple medications were prescribed for Plaintiff's pain, depression, muscle spasms, and insomnia. (TR 420). Dr. Shultz noted that "fibromyalgia is a diagnosis based on clinical symptoms and exclusion of any inflammatory causes for joint and muscle pain" and therefore the physician would obtain laboratory testing to rule out inflammatory causes. (TR 420). Plaintiff returned to Dr. Shultz for follow-up treatment in June 2007, October 2007, February 2008, and September 2008. (TR 584-586, 587-588, 723-726, 718-720). In June 2007 Dr. Shultz continued several of the previous medications prescribed for Plaintiff's fibromyalgia, including Neurontin®[4], Tizanidine[5], Lortab®[6], and

---

[4] Neurontin (gabapentin) is prescribed to help control seizures and neurologic pain. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/

[5] Tizanidine is prescribed to help relieve muscle spasms. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000106/

[6] Lortab (hydrocodone) is a narcotic pain medication. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014/

7

Clonazepam[7], and Dr. Shultz added Oxycontin®[8], Prozac®[9], and Celebrex®[10] to the regimen to treat Plaintiff's increased pain and "very poor sleep [with] multiple awakenings." (TR 589). In March 2009, Dr. Shultz noted that Plaintiff related that her current medications were helping to keep her pain manageable on a day to day basis although she struggled with daytime drowsiness, particularly after taking her mid-afternoon medications and she had to take frequent naps. (TR 713). Plaintiff also related that her shoulders were painful and her depression was not eased despite taking two anti-depressant medications. (TR 713). Dr. Shultz noted that Plaintiff appeared "fatigued and depressed," that stress was contributing to her depression and pain, that her fibromyalgia was "fairly severe" and "varying from day to day," that her previously-prescribed medications were continued, and that a psychiatric evaluation was recommended for her "severe" depression. (TR 714). Her medications

---

[7] Clonazepam is prescribed to treat seizures and anxiety. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/

[8] Oxycontin (oxycodone) is a narcotic pain medication. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589/

[9] Prozac (fluoxetine) is used to treat depression. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/

[10] Celebrex (celecoxib) is a nonsteroidal anti-inflammatory medication. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001050/

included Oxycontin®, Lortab®, Cymbalta®[11], Gabapentin, Celebrex®, Clonazepam, Requip®[12], Tizanidine, and Prozac®. (TR 713).

In each of these treatment records, Dr. Shultz noted that Plaintiff's examination showed tenderness to palpation and hypersensitivity in multiple joints and muscle groups. (TR 419, 584, 588, 714, 719, 724). The physician also noted in these treatment records that Plaintiff was 5'4" tall and weighed 243 pounds (April 2007)(TR 598), 250 pounds (October 2007)(TR 660), and 261 pounds (March 2009)(TR 713-714). Plaintiff testified at her hearing that she continued to see Dr. Shultz for follow-up treatment of her fibromyalgia. (TR 29).

## II. ALJ's Decision

The ALJ issued a decision in October 2009 in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 9-19). Following the well-established sequential evaluation procedure employed by the agency, 20 C.F.R. §§ 404.1520(a) - (g), 416.920(a) - (g), the ALJ found at step one that Plaintiff was insured for the purpose of Title II disability insurance benefits only through March 31, 2003. (TR 11). At step two, the ALJ found that Plaintiff had not engaged in substantial gainful activity

---

[11] Cymbalta (duloxetine) is used to treat depression and generalized anxiety disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/

[12] Requip (ropinirole) is used to treat Parkinson's disease and restless legs syndrome. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001026/

"since December 31, 1999, the alleged onset date."[13] (TR 11). The ALJ also found at step two that Plaintiff had severe impairments due to fibromyalgia, arthritis, morbid obesity, depression, and anxiety. (TR 11). At the third step, the ALJ found that these impairments were not presumptively disabling under the agency's Listing of Impairments. (TR 12-14).

The ALJ found at step four that despite Plaintiff's severe impairments she had the residual functional capacity ("RFC") to perform sedentary work except that she could only occasionally stoop, crouch, kneel, balance, or climb stairs, she was not able to climb ladders, and she could perform work "consist[ing] mainly [of] simple tasks and she should avoid public contact." (TR 14). The ALJ found that this RFC for work precluded the performance of any of Plaintiff's previous jobs. (TR 18). Relying on the VE's testimony concerning the availability of jobs for an individual with Plaintiff's vocational characteristics and RFC for work, the ALJ found at step five that Plaintiff was not disabled because there were jobs available in the economy which she could perform, including the jobs of lamp shade assembler and hand suture winder. (TR 18-19). The Appeals Council declined to review this decision (TR1-4), and Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

III. Standard of Review

The Social Security Act defines disability as the "inability to engage in any substantial

---

[13] Curiously, the ALJ did not recognize in his decision that Plaintiff had amended her alleged disability onset date during the hearing.

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). Judicial review of a decision by the Commissioner in a social security case is limited to a determination of whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991). In reviewing the decision of the Commissioner, the court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). The "determination of whether the ALJ's ruling [which becomes the Commissioner's decision] is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009)(citations, internal quotation marks, and brackets omitted).

## IV. Evaluation of Medical Source Statement

Plaintiff contends that the ALJ erred in evaluating the opinion of her treating rheumatologist, Dr. Shultz, concerning her functional limitations. In June 2009, Dr. Shultz authored a written assessment of Plaintiff's RFC for work-related activities in which the physician stated that as of (and continuing after) March 31, 2003, Plaintiff could sit only two hours in an 8-hour workday, stand one hour in an 8-hour workday, and walk two hours in an 8-hour workday. (TR 711). Dr. Shultz opined that Plaintiff could lift objects weighing under

11

ten pounds but not ten pounds or more, she could not lift repetitively, she could not work an 8-hour day, and she could handle objects for short periods of time but could not perform repetitive movements due to pain. Additionally, Plaintiff could not use her feet for pushing leg controls and she could not work an 8-hour day with the option of sitting and standing alternately. Dr. Shultz further stated that Plaintiff had "difficulty focusing and concentrating on tasks due to her chronic pain and fatigue. Physical and emotional stress worsen[s] her pain. She has depression which contributes [to] and worsens her symptoms." (TR 711).

When an ALJ considers the opinion of a disability claimant's treating physician, the ALJ must follow a specific procedure in analyzing the medical opinion. Generally, an ALJ must give the opinion of an acceptable treating source controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id. In that event, the ALJ must determine what weight, if any, should be given to the opinion by considering such factors as:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the

opinion.

Id. at 1031 (quotation omitted). See 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ "must give good reasons ... for the weight assigned to a treating physician's opinion" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." Watkins, 350 F.3d at 1300 (quotations omitted). The ALJ must also set forth specific, legitimate reasons for completely rejecting an opinion of an acceptable treating source. Id. at 1301.

In the ALJ's decision, the ALJ recognized that Dr. Shultz had provided an opinion concerning Plaintiff's work-related RFC and that the opinion must be analyzed under the prevailing standard set forth in Watkins, supra. (TR 17). The ALJ found that Dr. Shultz's opinion was not entitled to controlling weight because there was "not enough objective evidence of medical conditions severe enough to support the level of disabling pain the claimant claims she suffers on a daily basis. All testing, including lab work, x-rays, MRI's, and CT scans are fairly normal."[14] (TR 17).

Even a cursory understanding of fibromyalgia would have benefitted the ALJ in his evaluation of Dr. Shultz's opinion and the medical record in this case. "[F]ibromyalgia

---

[14] The ALJ also noted that Plaintiff had sought treatment from three different rheumatologists, Dr. Leahey, Dr. Brown, and Dr. Shultz, and that "[t]he evidence did not provide me with a reason for the changing of doctors." (TR 17). This statement has no bearing on the factors the ALJ was obligated to consider in evaluating the weight to be given to Dr. Shultz's opinion. Moreover, the record includes Plaintiff's explanation as to why she changed doctors. (TR 178). Her explanation, including the loss of insurance and ineffective treatment, was both adequate and reasonable.

13

presents a conundrum for insurers and courts evaluating disability claims" because "no objective test exists" for proving fibromyalgia. Welch v. Unum Life Ins. Co. of America, 382 F.3d 1078, 1087 (10th Cir. 2004)(internal quotation marks and citations omitted). The impairment, which can be disabling, has been described by the Seventh Circuit Court of Appeals:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principle symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and - the only symptom that discriminates between it and other diseases of a rheumatic character - multiple tender spots, more precisely 18 fixed locations on the body ( and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

Sarchet v. Chater, 78 F.3d 305, 306, 307 (7th Cir. 1996). See Ward v. Apfel, 65 F.Supp.2d 1208, 1213 (D.Kan. 1999)(recognizing that "the pain suffered by those diagnosed with fibromyalgia can be disabling"). In this case, then, the fact that "[a]ll [objective] testing ... [is] fairly normal" is entirely consistent with the Plaintiff's fibromyalgia. (TR 17). Because of the subjective nature of this impairment, "the lack of objective test findings . . . is not determinative of the severity of her fibromyalgia." Gilbert v. Astrue, 231 Fed. Appx. 778, 784, 2007 WL 1068104, * 4 (10th Cir. Apr. 11, 2007)(unpublished op.). The ALJ failed entirely to consider whether the treatment records of Dr. Shultz and other treating physicians reflected the presence of symptoms, such as diffuse pain, stiffness, and/or fatigue, that were consistent with Dr. Shultz's opinions in her medical source statement.

14

As the Commissioner points out in his responsive brief, an ALJ must determine whether a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Social Security Ruling 96-2p, 1996 WL 374188, at *2. If not, then the opinion is not entitled to controlling weight. Watkins, 350 F.3d at 1300. Dr. Shultz's opinion was supported by her treatment records, which consistently included findings of the characteristic tender spots in Plaintiff's joints and muscles, and the ALJ's cursory rejection of Dr. Shultz's opinion on the basis of the lack of "objective evidence" reflects a lack of understanding of the nature of Plaintiff's condition. The Commissioner's argument in his responsive brief that other reasons, beyond those contained in the ALJ's written decision, support the rejection of Dr. Shultz's medical source statement are, of course, hindsight that cannot salvage the legal error.

In light of this error in the ALJ's evaluation of Dr. Shultz's medical source statement, the Commissioner's decision should be reversed and remanded for further administrative proceedings.

V. Credibility

Plaintiff contends that the ALJ's evaluation of the credibility of her subjective statement was defective. The undersigned agrees. "Credibility determinations are peculiarly the province of the finder of fact," and credibility determinations will not be upset "when supported by substantial evidence. Nevertheless, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and

alteration omitted).

In this case, the ALJ recognized that under Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987), the ALJ was required to consider all of the evidence because Plaintiff had shown objective medical evidence of a pain-producing impairment. The ALJ stated that Plaintiff had "met this threshold requirement" because she had "conditions known in some circumstances to be productive of work involving public contact." (TR 15). Despite the incongruous nature of this statement, the ALJ recognized that Plaintiff had satisfied the initial requirement of presenting evidence of a pain-producing impairment. The ALJ further recognized that certain factors, as set forth in Social Security Ruling 96-7p and Luna, 834 F.2d at 165-166, are considered in evaluating the credibility of a claimant's allegations of disabling pain or other symptoms. (TR 15). The ALJ then briefly described portions of the medical record, noting that Plaintiff had been treated by Dr. Leahey for symptoms, including fatigue, depression, anxiety, and painful joints, that Dr. Shultz had diagnosed her with fibromyalgia and that Dr. Shultz had described Plaintiff's symptoms, including high fevers, insomnia, fatigue, diffuse pain, depression, anxiety, and positive tender points over several joints. (TR 16). The ALJ noted that Plaintiff was being treated at a mental health clinic for symptoms associated with her "physical pain" and "worsening health condition" as well as personal stressors. (TR 16). The ALJ further noted that Plaintiff had been diagnosed with sleep apnea, dyspnea, asthma, and obesity and prescribed a CPAP machine. Finally, the ALJ writes that Plaintiff was treated by Dr. Shultz in March 2009 at which time Plaintiff reported that her "medications were controlling her pain adequately but her antidepressants were not working

16

well enough," that she was having suicidal thoughts, trouble going to sleep, and trouble staying asleep, as well as carpal tunnel symptoms, and that "[s]he was advised to ask her caregivers at Mental Health Services for an alternate antidepressant because Dr. Shultz believed it was necessary to control her fibromyalgia symptoms." (TR 16). After this brief recitation of the medical record, the ALJ stated his conclusion in boilerplate language that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (TR 16).

This credibility evaluation is deficient in that (1) the ALJ mischaracterized the evidence, particularly the office notes of the March 30, 2009 examination of Plaintiff by Dr. Shultz, and (2) the ALJ provided no references to the record that even remotely supported the ALJ's RFC findings. Dr. Shultz's office note of her March 2009 examination of Plaintiff reflects that Plaintiff related her current medications made her pain "manageable" but that she continued to have "good days and bad days," and Dr. Shultz noted that Plaintiff's fibromyalgia was "fairly severe" and that she appeared "fatigued and depressed." (TR 713-714). The ALJ's statement that Plaintiff related her medications were "controlling her pain adequately" simply is not found in the record of this treatment note. (TR 16). The ALJ's statement that this treatment note indicated "Dr. Shultz believed [an alternate antidepressant] was necessary to control [Plaintiff's] fibromyalgia symptoms" is also not found in Dr. Shultz's treatment note. The treatment note as it appears in the record actually states that Plaintiff's "depression remains severe" and that Dr. Shultz recommended Plaintiff see a

17

psychiatrist. (TR 714). More significantly, none of the record evidence cited by the ALJ supports the credibility determination.

Thus, the only remaining reasons provided by the ALJ are contained in the boilerplate statement appearing in the decision, described previously, and this statement does not provide substantial evidence to support the ALJ's credibility determination. The Commissioner's decision should be reversed and remanded for further administrative proceedings to correct this error. To the extent Plaintiff asserts other errors in the ALJ's decision, the undersigned declines to consider the remaining asserted errors in light of the recommended disposition of this matter for the significant errors found above.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits and REMANDING the matter for further administrative proceedings consistent the findings herein. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____August 15th_____, 2011, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this  26th  day of  July , 2011.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE